UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
NASDI LLC,                              :
                                        :
                          Plaintiff,    :        17cv3578 (DLC)
                                        :
              -v-                       :        OPINION AND ORDER
                                        :
SKANSKA KOCH INC. KIEWIT                :
INFRASTRUCTURE CO. (JV) d/b/a SKANSKA   :
KIEWIT JV,                              :
                                        :
                          Defendant.    :
                                        :
--------------------------------------- X

APPEARANCES

For plaintiffs:
Mark L. McAlpine
Douglas W. Eyre
Thomas H. Trapnell
McAlpine PC
3201 University Drive, Ste 100
Auburn Hills, MI 48326

For defendants:
Paul Monte
Melissa Salsano
Peckar & Abramson, P.C.
41 Madison Avenue
20th Floor
New York, NY 10010

DENISE COTE, District Judge:

     Plaintiff NASDI LLC ("NASDI") worked as a subcontractor for

defendant Skanska Koch Inc. Kiewit Infrastructure Co. (JV)

("SKK") on the demolition and reconstruction of a bridge between

New York and New Jersey (the "Project").  Days before the final

stage of the Project was to begin, NASDI walked off the Project,

citing SKK's refusal to pay additional costs NASDI demanded due to the delay in commencing that final stage of the Project.

NASDI now brings this action to recover the excess costs it asserts it sustained during the early phases of the Project and for various Project delays.  It is largely undisputed, however, that NASDI failed to comply with the notice and claim procedure in its agreement with SKK (the "Subcontract").  Therefore, in addition to its breach of contract claim, NASDI also asserts that SKK had abandoned the Subcontract through making substantial changes to the Project and that NASDI is therefore entitled to recover its costs on a theory of quantum meruit. NASDI also pursues a claim that, just before NASDI walked off the Project, SKK breached the covenant of good faith and fair dealing imposed by the Subcontract.

SKK has responded with counterclaims against NASDI for breach of contract and for indemnification.  This Opinion resolves SKK's motion for summary judgment on NASDI's claims and on SKK's counterclaim for breach of contract.  For the following reasons SKK's motions are granted.

## Background

The following facts are undisputed or taken in the light most favorable to NASDI, unless otherwise noted.  In 2013, the Port Authority of New York & New Jersey (the "PA") selected SKK

as its general contractor to reconstruct the Bayonne Bridge,
which connects Staten Island, New York to Bayonne, New Jersey.
The PA and SKK executed their agreement in April 2013 (the
"Prime Contract").

The Subcontract

SKK executed the Subcontract with NASDI in July 2013.
NASDI was to perform the demolition work on the Project and
receive a total payment of $20,359,375.  Pursuant to §4.2, that
sum would distributed in a series of "Progress Payments" made
"pursuant to payment applications to be submitted by
Subcontractor to Contractor, for the value of Subcontractor's
Work completed during each prior Payment Period as jointly
estimated by Subcontractor and Contractor, using a mutually
agreed upon Price Breakdown."

Section 5 of the Subcontract acknowledged SKK's control
over the schedule for the Project.  It provides:

> 5. SCHEDULING AND PROSECUTION OF THE WORK. . . .
> Subcontractor agrees to proceed with the
> determinations of Contractor as to the times when and
> locations where Subcontractor's work shall be
> performed in order to coordinate same with other Work
> consistent with the overall intent of the Progress
> Schedule.  Contractor does not assure Subcontractor
> that it shall be able to commence, prosecute or
> complete its Work at the time stated, or in the
> sequence, manner or durations provided for in any
> Progress Schedule, or that the entire Work shall be
> completed at the time fixed in such Progress Schedule.
> A reasonable number of multiple come-backs, and of
> multiple or partial punch lists are anticipated and

> allowed for by Subcontractor in the Subcontract Price.
> <u>Subcontractor's completion of its Work within the</u>
> <u>Prime Contract time for completion of the Work, AND</u>
> <u>the Progress Schedule, AND WITHIN any interim PRIME</u>
> <u>CONTRACT milestones applicable to its WORK, AND</u>
> <u>subcontractor's cooperation with Contractor's efforts</u>
> <u>to schedule and coordinate the Prime Work, ARE of the</u>
> <u>essence of this Subcontract.</u>

(emphasis in original).

Appendix A to the Subcontract set forth a number of target dates by which NASDI was to complete its work.  The Appendix indicated that these dates were provisional because the overall schedule for the Project had not been finalized.  SKK did not share the overall schedule for the Project with NASDI prior to NASDI executing the Subcontract.

Pursuant to §6 of the Subcontract, entitled "Changes and Extras," SKK could "at any time order or require changes in Subcontractor's Work consisting of additions, deletions or other revisions, with the Subcontract Price being adjusted accordingly ("Change Order")."  Section 6.1.1 details the payment procedure for "changes in the Work that have been initiated by the [PA]."  If the PA is the source of NASDI's change in work, NASDI is directed to

> promptly submit any Claims it may have . . . in
> sufficient time to allow [SKK] to process such Claims,
> credits or deductions with the [PA] within the time
> and in the manner provided for in the Prime Contract.

Where the changes are "not initiated or payable to" SKK by the PA, §6.1.2 made compensation to NASDI "payable pursuant to separate written agreement."

Under §6.4, the failure of NASDI "to immediately commence performance of any Change Order" when directed to do so is a "material breach" of the Subcontract.  Where SKK and NASDI have not agreed upon the additional compensation due following a change, NASDI "may reserve its rights to extra compensation . . . by delivering to [SKK] written notice of a Claim therefor pursuant to Section 7, or 23,[1] whichever may apply, prior to the commencement of any extra work."

Section 7 of the Subcontract provides the procedure for NASDI to make "Claims."  The Subcontract defines a "claim" broadly as "any request, demand, or claim for, extra or additional compensation in money, extension of time . . . or other relief arising under or relating to the Subcontract."

Section 7.1 sets forth the notice and documentation requirements for NASDI to make a claim:

---

[1] Section 23 applies, _inter alia_, to a claim by NASDI "of a type or character not addressed elsewhere in this Subcontract."  It also includes choice of law and forum provisions and contains a waiver by NASDI for "any claim for special, incidental, consequential or penal damages."  As a condition precedent to a suit for damages, NASDI must comply "with all the notice provision of this Subcontract applicable to such item of Claim or damage."

7.1 NOTICE OF CONDITION.  Unless a shorter time limit is required under the Prime Contract, within twenty-four (24) hours after the commencement of any condition claimed to be grounds for a Claim, Subcontractor shall give Contractor a written statement of any such condition, together with the particulars of time and money claimed and the reason(s) therefor, and thereafter submit updates of such particulars to Contractor from time to time not more than thirty (30) days after any further such costs or losses of time are incurred.

Section 7.3 affirms that such notice was to be strictly

observed:

7.3 STRICT COMPLIANCE.  Without limitation, <u>strict compliance</u> with all of the terms of this Section and all other "notice" provisions of or incorporated into this Subcontract <u>is a condition precedent</u> to the assertion by Subcontractor of Claims or suits of any kind.  The failure of Subcontractor to timely and strictly comply with the requirements of this Section 7 will be <u>conclusively deemed to be a waiver</u> by Subcontractor of, and will relieve Contractor of all responsibility to present or pay for, any such Claim or dispute.  Contractor's acceptance, presentation or prosecution of Subcontractor's Claim shall not constitute a waiver by Contractor of any previous failure by Subcontractor to strictly comply with this Section 7.

(emphasis supplied).

Section 7 also incorporates certain recordkeeping

requirements from the Prime Contract.  Section 7.2.2 requires

NASDI to track the costs associated with changes that the PA

makes in accordance with §34 of the Prime Contract.  Section 34

of the Prime Contract, in turn, requires that whenever SKK or a

subcontractor performs "extra work" pursuant to a change from

the PA, SKK or the subcontractor must document the costs of labor, materials, and equipment at the end of each day of extra work.  The Prime Contract warns that failure to do so may result in waiver of extra compensation.

Section 7.2.5 of the Subcontract describes the procedure for resolution of an unallocated settlement from the PA, in which the PA does not determine the value of each subcontractor claim individually, but instead gives SKK a global amount for all claims, and SKK determines how much to pay each subcontractor.  Section 7.2.5 states:

> In the event of a recovery or settlement from Owner which does not expressly allocate an amount to or for Subcontractor's Claim, the parties shall endeavor to agree upon such allocation in good faith; if they are unable to so agree, the allocation of such recovery expenses and costs made by Contractor in good faith shall be binding and conclusive upon Subcontractor.

Section 13.1 of the Subcontract provides that the claims procedure in §7 is the exclusive means for NASDI to pursue damages for delay:

> 13.1 NO DAMAGE FOR DELAY.  Except as otherwise provided in Section 7 above, Subcontractor agrees that it shall have no Claim against Contractor for any loss or damage it may sustain through delay, disruption, suspension, stoppage, interference, interruption, compression, or acceleration of Subcontractor's Work ("Delay Damages") caused or directed by Contractor for any reason, and that all such Claims shall be fully compensated for by Contractor's granting Subcontractor such time extensions as it is entitled to as a result of any of the foregoing.  If, for any reason, Contractor is nevertheless found independently liable

> to Subcontractor for Delay Damages, such damages,
> whether governed by contract, tort or otherwise, and
> whether characterized as direct, special, incidental,
> consequential, or otherwise, <u>shall [be] governed by
> Article 7</u> above.

(emphasis supplied).  Lastly, the Subcontract requires NASDI to furnish separate performance and payment bonds, equal to the amount of the Subcontract price.

<u>The Project</u>

NASDI's task was to demolish the approach structures and main bridge roadway and supports on the Bayonne Bridge.  The work on the Project was divided into four "Stages," with NASDI responsible for performing work during Stages 1, 2, and 4. Stage 1 entailed NASDI removing sidewalks and support girders from the approach and main span of the bridge.  In Stage 2, NASDI was to cut "pockets" in the approach deck to the bridge so that the substructure of the new bridge could be installed.  As part of Stage 2, NASDI was to complete a partial demolition of the road deck on the main span of the bridge.  Finally, in Stage 4, NASDI was to remove the remaining road deck and substructure of the old bridge structure.

NASDI completed its work for Stages 1 and 2, but walked off the job just as work on Stage 4 was about to commence.  SKK then replaced NASDI with NASDI's own demolition subcontractor.

<u>Stages 1 and 2</u>

8

NASDI asserts that three changes to its work in Stages 1 and 2 gave rise to excess costs for which it now seeks compensation.  Stage 1 of the demolition initially called for converting sidewalks on the bridge along the approaches into travel lanes (the "Sidewalk Conversion").  NASDI was to use this space as a staging area and for ingress and egress.  SKK and the PA, however, determined that the Sidewalk Conversion was not necessary and removed that from the plans sometime in 2013.  The PA issued a change order removing the Sidewalk Conversion from the Project on February 25, 2015.  In August and September 2015, NASDI and SKK exchanged emails regarding the updated cost of NASDI's work on Stage 1 without the Sidewalk Conversion.  On September 14, 2015, a NASDI representative offered SKK a credit of $161,096 to account for the deletion of the Sidewalk Conversion from NASDI's scope of work.

SKK also made changes that affected NASDI during Stage 2. SKK directed NASDI to demolish the approach structure of the bridge in a different sequence than what is set forth in the Subcontract.  As a result of this change, NASDI had to remove its equipment from the site after each shift and reinstall it at the beginning of the next shift.  NASDI asserts that this change added to its costs by requiring it to work primarily at night.

NASDI did not submit a claim as required by §7 of the Subcontract for the additional compensation it seeks through this lawsuit for its Stage 1 and Stage 2 work, including for costs incurred due to the above-described alterations to the scope of its work.  NASDI completed its Stage 1 and 2 work by December 2014, ten months after the Subcontract's target date for completion of the first two stages.  It then demobilized its workforce at the Project as it waited for Stage 4 to begin.

June Claim

Stage 4, scheduled to commence in July 2015, did not begin until February 2017.  Prior to the beginning of Stage 4, the demolition method for the Project changed in two ways. Originally, the Subcontract called for NASDI to perform a "Panelized Demo" in Stage 4.  After the new roadway was constructed, NASDI would cut the old road deck into panels and lower those panels onto barges located in the channel. According to NASDI, however, SKK changed the demolition protocol to the "stick method" -- i.e., removing the road deck piece-by-piece and using trucks to transport the pieces offsite.[2]  SKK

---

[2] SKK disputes that it ordered the change to the demolition procedure.  In a July 11, 2016 letter, NASDI explained to SKK that "numerous unresolved issues" necessitated a change in the demolition methodology and that NASDI had "elected" to use the stick method because "in its opinion, that method was the safest" and most efficient way to complete Stage 4.  Minutes of a meeting that occurred just before Stage 4 was to begin state

also changed NASDI's duties by requiring NASDI to work simultaneously on more than three headings of the bridge.

By mid-2016, it was clear that work on Stage 4 would be delayed. In light of that delay, SKK requested that NASDI submit a claim for additional costs NASDI would incur during its work on Stage 4. On June 2, 2016, NASDI submitted a schedule of "the additional costs associated with the new contract completion date" (the "June Claim"). As NASDI's corporate designee testified, the figures quoted in the June Claim were prospective. The June Claim lists five categories of increased costs for its Stage 4 work: wage increases, scrap steel prices, working in winter conditions, inflation, and financial carrying costs. Added together, NASDI concluded that it would incur approximately $7.5 million in additional costs during Stage 4.

SKK submitted the June Claim to the PA along with claims from other subcontractors. Rather than review and pay each subcontractor claim, however, the PA indicated that it would likely enter into an aggregate settlement with SKK. SKK, in turn, would be responsible for compensating the individual subcontractors.

---

that "NASDI has selected to use the stick demolition method because of schedule concerns" and that "NASDI has selected which demolition method they plan to use."

Following lengthy discussion between SKK and NASDI, on December 21, 2016, SKK sent NASDI a revised work schedule for Stage 4 of the demolition, with a start date of February 22, 2017 and a completion date of June 2, 2017.[3]  NASDI agreed to begin Stage 4 on that schedule.  The relationship frayed shortly thereafter.

A week later, on December 30, 2016, NASDI's legal counsel demanded that SKK settle the June Claim.  In doing so, NASDI suggested for the first time that the Subcontract was no longer in force: the delay in the Project was "more than ample grounds to establish a material breach of the [Sub]contract sufficient to excuse [NASDI's] performance."  "[B]efore [NASDI] can reaffirm its contract with SKK," the letter states, "the impact of the delay must be resolved."  NASDI demanded a response to its June Claim.  Nevertheless, "[b]efore refusing performance," NASDI proposed a meeting to discuss "further costs and schedule concessions" before NASDI would commence work on Stage 4.

In a January 6 letter, SKK reminded NASDI that the Subcontract "expressly requires [NASDI] to proceed with its work while a change order request or claim for an adjustment to the subcontract is pending."  It warned NASDI that it was required

---

[3] SKK asserts that the PA was responsible for a delay in commencing Stage 4.

commence mobilization and proceed diligently with its work or be in default under the Subcontract.

As for the June Claim, SKK advised that "NASDI's claims relative to the delay to the Project are pass-through claims" to the PA, which SKK was still negotiating.  SKK informed NASDI that settlement negotiations with the PA

> will probably not be completed until some point later in 2017 at which time a change order will be issued and from which NASDI will be entitled to an adjustment to its subcontract.  Until such time, however, NASDI's subcontract requires it to continue with its work as directed.

SKK also provided its "preliminary review" of the June Claim.  SKK took issue with several of NASDI's assumptions in the calculation of its June Claim, stating that NASDI's figure of $7.5 million was "largely unsupported and grossly overstated."  SKK questioned, inter alia, NASDI's assertion that the delay had been three years, NASDI's projected costs for winter work, and NASDI's entitlement to lost revenue for salvage materials.  NASDI responded on January 10, agreeing to proceed under protest given the threat of default.

On February 1, 2017, SKK informed NASDI in writing that, although SKK and the PA were "a long way" from a final agreement, the PA would likely enter into a global settlement with SKK (the "February 1 Letter").  The February 1 Letter reminded NASDI that an unallocated settlement would trigger

13

Section 7.2.5 of the Subcontract.  The global settlement would cover "all known impacts up to December 1, 2016."

SKK also provided a detailed analysis of the June Claim, concluding that the total due NASDI on the June Claim was $602,526.73.  Analyzing all NASDI's outstanding claims, including credits due SKK, SKK concluded that NASDI in fact owed SKK approximately $733,000.  This included a credit to SKK of $819,747.00 for the deletion of the Sidewalk Conversion at Stage 1.

NASDI Sends Notice of Termination

On February 17, NASDI provided SKK with a Notice of Termination.  The Notice of Termination asserted that SKK had "abandoned" the Subcontract due to the "substantially delayed schedule," the "complete and substantial change in the means, methods and sequencing of the work," and SKK's failure to negotiate the June Claim in good faith.  NASDI maintained that SKK's computation of the value of NASDI's claims in the February 1 Letter "amount[ed] to aggravated bad faith."[4]  NASDI advised that it would immediately demobilize its workforce from the worksite and would not commence Stage 4 work.

---

[4] NASDI also asserted in the Notice that there was no evidence that SKK had ever presented the June Claim to the PA.  NASDI no longer disputes that SKK submitted the June Claim to the PA.

14

SKK responded on February 19 with a notice of potential default and request to cure.  SKK maintained that the revised schedule for Stage 4 was the product of a "year-long discussion" that "culminated with the agreement" in December 2016 of the parties to the new start date.  In any event, SKK wrote, the Subcontract entitled SKK to change the schedule at its discretion.  SKK advised that NASDI's claims depended upon the outcome of SKK's settlement negotiations with the PA, which were ongoing, and that SKK would conduct a global claims settlement in accordance with §7.2.5 of the Subcontract.

The February 19 letter also described meetings with NASDI on February 2 and February 6 in which SKK

> outlined a plan pursuant to which NASDI would be
> afforded the opportunity to receive material
> additional compensation in the form of both guaranteed
> monies plus incentive payments despite the fact that
> the evaluation of NASDI's claim on the merits coupled
> with its performance to date, scope reductions and
> backcharges results in a net credit to SKK.

SKK warned that NASDI's February 17 Notice of Termination was a breach of the Subcontract.  If NASDI did not immediately rescind the Notice of Termination, SKK would invoke the Subcontract's termination clause and perform the demolition work itself, with NASDI covering the cost.

15

In an email of February 23, "rescind[ed] its termination letter of February 17, 2017." But the email also demanded an immediate payment of $1,923,823.27.

SKK Fires NASDI

In a letter of February 23, SKK declared NASDI in default. SKK explained that NASDI's email did not "effectively" rescind its Notice of Termination. NASDI's failure to return to work on February 21, as had been agreed, was further evidence of its failure to rescind its Notice of Termination. Accordingly, SKK invoked §11.1 of the Subcontract, fired NASDI from the Project, and terminated the Subcontract as of that very day.

SKK hired Atlantic Coast Dismantling/Environmental and Infrastructure Group (JV) ("ACD/EIG") to complete the demolition of the approaches to the main span at a cost of approximately $24 million.[5] SKK itself performed portions of the Stage 4 demolition, which added another $24 million in costs. To finance the cost of the Stage 4 demolition, SKK made a demand on NASDI's performance bond.

NASDI filed this action on May 12, 2017, asserting three causes of action. It brings a breach of contract claim based on SKK's failure to pay NASDI for additional costs incurred under

---

[5] On February 10, 2017, NASDI had executed a contract with ACD/EIG to complete NASDI's work on Stage 4 of the Project.

the Subcontract; a claim under quantum meruit for SKK's acceptance of NASDI's demolition services despite SKK abandoning the Subcontract; and a claim for breach of the covenant of good faith and fair dealing for SKK's calculation of NASDI's portion of the global settlement with the PA.  SKK has counterclaims against NASDI for any costs associated with completing the demolition not covered by NASDI's performance bond.

Following the conclusion of discovery, on February 28, 2020, SKK moved for summary judgment dismissing NASDI's claims and finding NASDI liable on SKK's counterclaims.  The motion was fully submitted on April 10.  This action was reassigned to this Court on April 23.

## Discussion

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Smith v. Cnty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the

light most favorable to the non-moving party.  See Eastman Kodak
Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).
"Where, as here, the party opposing summary judgment bears the
burden of proof at trial, summary judgment should be granted if
the moving party can point to an absence of evidence to support
an essential element of the nonmoving party's claim."  Gemmink
v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015).  In making
this determination, the court "draws all inferences in favor of
the nonmoving party."  Id.  Once the moving party has made a
showing that the non-movant's claims cannot be sustained, the
party opposing summary judgment "must set forth specific facts
demonstrating that there is a genuine issue for trial."  Wright
v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted).

    "[C]onclusory statements, conjecture, and inadmissible
evidence are insufficient to defeat summary judgment."  Ridinger
v. Dow Jones & Co., 651 F.3d 309, 317 (2d Cir. 2011) (citation
omitted).  Only disputes over material facts will properly
preclude the entry of summary judgment.  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).  "An issue of fact is
genuine and material if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party."  Cross
Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d
Cir. 2016).

I.  Breach of Contract

NASDI asserts a claim for damages under the Subcontract for the two-year delay in commencing Stage 4 and for four sets of costs associated with Stages 1 and 2: (1) the ten-month delay in completion of those stages, (2) deletion of the Sidewalk Conversion, (3) re-sequencing of NASDI's work, and (4) forcing NASDI to work primarily at night.

The elements of a breach of contract action in New York are well-established.[6]  They are "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).

Under New York law, "a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties."  In re MPM Silicones, 874 F.3d 787, 795 (2d Cir. 2017).  If the intent of the parties is clear from the four corners of a contract, its interpretation is a matter of law that the court may determine by summary judgment.  American Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 316 (2d Cir. 2006).

---

[6] Pursuant to §23 of the Subcontract, New York law governs this dispute.

"The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous."  In re MPM Silicones, 874 F.3d at 795.

> An ambiguity exists where the terms of the contract
> could suggest more than one meaning when viewed
> objectively by a reasonably intelligent person who has
> examined the context of the entire integrated
> agreement and who is cognizant of the customs,
> practices, usages, and terminology as generally
> understood in the particular trade or business.

Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (citation omitted).  By contrast, a contract is unambiguous if its "language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion."  Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014).

"[A] motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning."  Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008).  Thus, "[t]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties."  Cont'l Ins. Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010) (citation omitted).

NASDI's breach of contract claims relating to the damages
it asserts it suffered from Project delays will be addressed
first.  A discussion of the remainder of its breach of contract
claims follows.

A.    Delay Claims

NASDI's delay claims can be divided into two groups.  NASDI
refers in passing to delays that affected Stages 1 and 2, which
were completed ten months later than scheduled in the
Subcontract.  NASDI's principal claim for damages due to delay
is associated, however, with the roughly two-year delay in the
commencement of Stage 4.  SKK asserts that the no-damages-for-
delay clause in § 13.1 of the Subcontract forecloses NASDI's
breach of contract claim for damages flowing from any of the
delays.  It does.

As set forth above, §13.1 is broadly worded.  In it, NASDI
waives its right to damages "for any loss or damage it may
sustain through" several occurrences, including "delay" or
"suspension . . . of Subcontractor's Work ("Delay Damages")
caused or directed by Contractor for any reason."  The sole
exception is for claims for such damages raised through the §7
claim procedure.

It is undisputed that NASDI never invoked the §7 claim
procedure for any costs it incurred from delay, whether those

costs were incurred in the first two stages of the Project or at any time prior to the commencement of work on Stage 4.[7]  SKK contends that NASDI's claim for damages based on those delays is therefore barred by the express terms of the Subcontract, including §13.1.  At SKK's invitation, however, NASDI did submit a claim for the increased costs it anticipated it would experience during Stage 4 due to the delay in the commencement of work on Stage 4.  Since NASDI never commenced work on Stage 4 of the Project, however, it has not shown that that delay caused it to incur any of those costs.

Enforceability of Section 13.1

Section 13.1 is an "exculpatory clause," and as such, it is "strictly construed against the party" that relies on it.  Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1008 (2d Cir. 1991) (citing Ippolito-Lutz, Inc. v. Cohoes Hous. Auth., 254 N.Y.S.2d 783, 784 (3d Dep't. 1964)).  It is also well-established, however, that these no-damage-for-delay clauses are "valid and enforceable and . . . not contrary to public policy if the clause and the contract of which it is a

---

[7] The sole reference to the Stage 1 and 2 delays is in an NASDI July 1, 2014 letter stating that NASDI had experienced "delay in completing the work [in Stages 1 and 2] as scheduled."  This letter does not invoke §7 or identify increased costs associated with the delays.  Instead, it assures SKK that NASDI has capacity to "meet all of [NASDI's] contractual obligations."

part satisfy the requirements for the validity of contracts generally." McNamee Constr. Corp. v. City of New Rochelle, 875 N.Y.S.2d 265, 266 (2d Dep't 2009) (quoting Corinno Civetta Constr. Corp. v. City of N.Y., 67 N.Y.2d 297, 309 (1986) ("Corinno")).  NASDI has not challenged the validity of the Subcontract generally.

The New York Court of Appeals has identified four exceptions to the enforceability of no-damages-for-delay clauses:

> Generally, even with such a clause, damages may be recovered for: (1) delays caused by the contractee's bad faith or its willful, malicious, or grossly negligent conduct, (2) uncontemplated delays, (3) delays so unreasonable that they constitute an intentional abandonment of the contract by the contractee, and (4) delays resulting from the contractee's breach of a fundamental obligation of the contract.

Corinno, 67 N.Y.2d at 309 (emphasis supplied).

A defendant bears the "prima facie burden of establishing that the damages sought by the plaintiff are barred by the no-damage-for-delay exculpatory clause of the parties' contract." Maric Mech., Inc. v. Dormitory Auth., 879 N.Y.S.2d 583, 583 (2d Dep't 2009).  If the defendant clears that threshold, plaintiff bears a "heavy burden" to raise a triable issue of fact that one of the four exceptions applies.  Dart Mech. Corp. v. City of N.Y., 891 N.Y.S.2d 76, 77 (1st Dep't 2009).  As the New York

23

Court of Appeals has instructed, a no-damages-for-delay clause would be "meaningless unless it encompassed within its scope a range of unreasonable as well as reasonable delays." Corinno, 67 N.Y.2d at 312. A plaintiff may not, therefore, rely upon evidence that defendant was merely negligent or unreasonable. Kalisch-Jarcho, Inc. v. City of N.Y., 58 N.Y.2d 377, 384-85 (1983). And, "if the conduct was contemplated by the parties when they entered into the agreement," it falls within the ambit of the exculpatory clause. Blau Mech. Corp. v. City of New York, 551 N.Y.S.2d 228, 229 (1st Dep't 1990).

"[O]rdinary, garden variety" poor performance by the contractee is within the contemplation of the parties, Corinno, 67 N.Y.2d at 313, and therefore conduct by a contractee "amount[ing] to nothing more than inept administration or poor planning" is not an exception to an exculpatory clause. Commercial Elec. Contractors, Inc. v. Pavarini Const. Co., 856 N.Y.S.2d 46, 47 (1st Dep't 2008). Finally, delays in complex, multi-contractor projects are usually contemplated. See Gottlieb Contr., Inc. v. City of New York, 446 N.Y.S.2d 311, 311 (1st Dep't 1982), aff'd, 58 N.Y.2d 1-51 (1983) (reasoning that "other prime contractors' inaction, faulty performance and defaults under their contracts" are all contemplated delays).

24

SKK has shown that the damages NASDI seeks for delays are barred by the no-damage-for-delay clause.[8]  Section 13.1 unambiguously states that NASDI's sole remedy for delays in the schedule of its work is to seek relief under §7, which includes a procedure for requests for an extension of the schedule or for additional compensation.

Furthermore, NASDI has not presented evidence that raises a question of fact regarding any of the exceptions to the application of this clause.  The Subcontract expressly contemplates that SKK or the PA can make changes to the Project schedule.  If NASDI encountered additional costs resulting from those delays, §7 provided its sole remedy.

Other provisions of the Subcontract underscore that delays were contemplated.  For example, in §5, NASDI "agrees to proceed with the determinations of [SKK] as to the times when and locations where [NASDI]'s work shall be performed in order to coordinate same with other Work consistent with the overall intent of the Progress Schedule."  Likewise, in that same provision, NASDI affirms "that it has taken into consideration

---

[8] It bears noting that NASDI has not identified with any precision in opposition to this motion what delay damages it suffered or how it intends to prove the existence of those damages at trial.

and made allowances for or assumes the risk of all reasonably foreseeable hindrances and delays incident to its Work."

Exception for Abandonment of Subcontract

NASDI does not make any developed argument that any of the four exceptions to the no-damages-for-delay clause in the Subcontract would support its claim for any damages it incurred from any delay in the Project.  It does, however, argue that the cumulative effect of all of the delays was so extreme that it constituted an intentional abandonment of the Subcontract by SKK.[9]

NASDI has not presented evidence to raise a question of fact in support of an assertion that SKK ever abandoned the Subcontract.  To raise a triable issue regarding abandonment in the context of no-damages-for-delay clause, the subcontractor must present evidence "that the [contractor] is responsible for delays which are so unreasonable that they connote a

---

[9] While NASDI's brief in opposition to this motion suggests that the exception for "uncontemplated" delays may also exist here, its Rule 56.1 Statement and its Dore Declaration do not rely on that exception to a no-damages-for-delay clause.  Given the many contract provisions addressing the ramifications of delay in this complex, multiphase public-works project, no reasonable jury could find that delays were not contemplated by the parties to the Subcontract.  They were, after all, sophisticated business entities engaged in a construction project with many other entities performing interrelated and essential tasks.  See Kalisch-Jarcho, 58 N.Y.2d at 384 (noting that no-damages-for-delay clauses are enforceable, "especially when entered into at arm's length by sophisticated contracting parties").

relinquishment of the contract by the [contractor] with the intention of never resuming it."  Corinno, 67 N.Y.2d at 313.

In support of its argument that SKK abandoned the Subcontract NASDI cites nothing more than the fact of delay itself.  NASDI does not point to any manifestation by SKK of any intent to relinquish the Subcontract.  It offers no evidence that SKK did not intend to complete the Project, including the demolition work required in Stage 4.

Until early 2017, both SKK and NASDI continued to adhere to the Subcontract; SKK continued to pay NASDI from February 2014 through November 2016.  The score of payments made during that period were pursuant to forms entitled "Partial Release and Partial Waiver of Lien," each of which stated that the payment was being made pursuant to the Subcontract.

Each release allowed NASDI to reserve its rights to additional compensation.  Paragraph 3 of each release states:

> 3. Upon receipt by the undersigned of a check from Contractor in the amount above, or adjusted amount, payable to the undersigned, and when the check has been paid, this document shall become effective to release and forever discharge Contractor and the Owner . . . from any and all claims, demands, liens and claims of lien whatsoever arising out of performance of all work for which payment has been made which it now has or hereafter might or could have except for the following:

27

The releases then instructed NASDI to list exceptions to the release of claims.  Each release executed by NASDI either states "None" or is blank.[10]

NASDI's argument that SKK abandoned the Subcontract is likewise belied by the parties' December 21, 2016 agreement that NASDI would soon begin its Stage 4 work.  It was not until December 30 that NASDI suggested that SKK had abandoned the Subcontract.  And in response, SKK repeatedly asserted that the Subcontract continued to govern their relationship.

Finally, in support of its contention that SKK had abandoned the Subcontract, NASDI has submitted an unsworn letter from a purported expert in demolition, Richard Riggs.[11]  In conclusory terms, Riggs opines that SKK's changes to the Project during Stages 1 and 2 to the Subcontract constituted abandonment.

As an initial matter, an unsworn letter is "an inappropriate response" to a motion for summary judgment and is "properly disregarded."  United States v. All Right, Title &

---

[10] SKK contends that these releases without reservations of rights are sufficient to foreclose NASDI's claims for delay or extra work.  Since NASDI's claims are dismissed on other grounds, it is unnecessary to reach this alternative argument.

[11] During his deposition, Riggs did not claim "to be an expert in anything."  Nevertheless, Riggs testified that he had spent his "entire career" in demolition.

Interest in Real Prop. & Appurtenances, 77 F.3d 648, 657-58 (2d Cir. 1996); see also Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005).  Even a properly sworn expert report, however, "is not a talisman against summary judgment."  In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 512 (2d Cir. 2010) (citation omitted).  "An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."  Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006); see also Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).

Even if Riggs's letter could be properly considered, it does not raise an issue of fact surrounding SKK's purported abandonment of the Subcontract.  Riggs concludes that "several" of the changes to the Project "amount[ed] to a cardinal change as recognized by the industry."  Yet, his letter offers nothing to buttress the bare conclusion that SKK abandoned the agreement.  It does not explain how or why the changes he discusses indicated that SKK had abandoned the Subcontract.  Nor does he address the numerous ways in which both parties continued to abide by the Subcontract's terms.

In short, SKK has provided uncontradicted evidence of its commitment to the Subcontract.  No reasonable factfinder could

conclude that SKK had abandoned the Subcontract.  As a consequence, NASDI has not carried its burden to show that the no-damages-for-delay clause contained in §13.1 of the Subcontract is unenforceable.  That clause therefore forecloses NASDI's claims for delay damages.

Before concluding this discussion of NASDI's claim for damages for delay it should be noted that, at SKK's invitation, NASDI did submit the June Claim for extra costs NASDI expected to incur during its work on Stage 4 of the Project on account of the delay in the commencement of that work.  The parties were still addressing that claim when NASDI refused to proceed with its Stage 4 work.  NASDI apparently contends that, as it concerns the delay in the commencement of Stage 4, SKK breached the Subcontract when SKK "refused . . . to consider an adjustment to NASDI's Stage 4 compensation."  This argument is misplaced.  Most notably, NASDI performed no work in Stage 4. It therefore did not incur expenses at Stage 4 for which SKK denied it compensation.

Furthermore, NASDI has not raised a factual issue that SKK's assessment of the June Claim amounted to a breach.[12]

---

[12] In the February 1 Letter, SKK explained how it arrived at the conclusion that NASDI was not due additional money under the Subcontract.  In opposition to this motion, NASDI has not pointed to evidence that would raise a triable issue of fact

Before NASDI abandoned the Project, there had yet to be a final decision on any extra monies owed to NASDI for its Stage 4 work. Even assuming that SKK had determined that it would refuse to grant NASDI an equitable adjustment, NASDI has not raised a triable issue of fact that such determination breached the Subcontract.  Pursuant to Section 7.2.5, SKK was entitled to allocate the proceeds of the global settlement; that determination was "binding and conclusive."

B.   Extra Work Claims

NASDI also asserts that SKK breached the Subcontract when it changed the nature of NASDI's demolition work in Stages 1 and 2 without compensating NASDI for the extra costs it incurred in performing that work.  Specifically, NASDI argues that SKK breached the Subcontract when it deleted the Sidewalk Conversion and required NASDI to work out of sequence and at night.

SKK moves for summary judgment on these claims because the Subcontract required NASDI to bring any request for additional payments due to changes to the scope of its work through the §7 claim process.  Because it is undisputed that NADSI did not seek payment for these changes through the presentation of a §7 claim, and because adherence to the §7 claim process is a condition precedent for recovery of such damages, SKK seeks

---

about the accuracy of any portion of the calculation SKK set forth in the February 1 Letter.

summary judgment on this branch of NASDI's breach of contract claims.  SKK's motion is granted.[13]

Under New York law, "a condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc., 821 F.3d 297, 305 (2d Cir. 2016) (citation omitted).  Courts should not assume that a provision embodies a condition precedent; the condition must be "expressed in unmistakable language." Id. (citation omitted).  Captioning or styling a provision as a condition precedent is sufficient to clear that threshold. Id.

In the context of construction contracts, where an agreement "contains a condition precedent-type notice provision setting forth the consequences of a failure to strictly comply, strict compliance will be required." Schindler Elevator Corp. v. Tully Const. Co., 30 N.Y.S.3d 707, 709 (2d Dep't 2016) (citation omitted).  "Express conditions precedent must be literally performed; substantial performance will not suffice,

---

[13] NASDI also asserts that its extra work claims could be brought as claims for delay. See Corinno, 67 N.Y.2d at 313 (treating "increased costs in labor, materials, and equipment" as claims for delay damages).  To the extent NASDI is correct that its extra work claims are delay damages, they are barred by §13.1, as explained above.

and failure to strictly comply with such provisions generally constitutes a waiver of a claim."  Id. (citation omitted).

The notice procedure set forth in §7 constitutes an unambiguous condition precedent for NASDI's recovery on its claims that it was damaged by having to perform extra work.  The Subcontract defines the term "Claim" broadly and that definition includes the claims for damages which NASDI asserts here. Section 1.7 states that

> the term "Claim" as throughout this Subcontract shall mean any request, demand, or claim for, extra or additional compensation in money, extension of time, a change or reduction of responsibility, the adjustment or interpretation of contract terms, or other relief arising under or relating to the Subcontract.

Section 7, in turn, bears the heading "Claims" and contains many subsections.  For example, §7.1 required NASDI to give SKK a "written statement" of its "Claim" within twenty-four hours. Section 7.2 explained that any claim for damage due to an order of the PA or its agent would not permit NASDI to assert a Claim against SKK.  Section 7.3 is entitled "Strict Compliance" and characterizes the notice procedure in §7 as a "condition precedent" to NASDI's recovery for "Claims or suits of any kind."  It warns that "[t]he failure of Subcontractor to timely and strictly comply with the requirement of this Section 7 will be conclusively deemed to be a waiver by Subcontractor of, and will relieve Contractor of all responsibility to present or pay

for, any such Claim or dispute."  Accordingly, unless NASDI complied with the requirements of §7, it waived its claims for extra work performed under the Subcontract.

In opposing this motion, NASDI has not shown that it complied with the notice procedure set forth in §7.  Indeed, its witnesses admit that it did not.  The deposition of NASDI's President, Arthur Dore Jr., contains an admission that NASDI did not give SKK written notice in connection with the cost overruns for the deletion of the Sidewalk Conversion or nighttime work. Likewise, NASDI's Vice President during the Project, Thomas Higgins, testified that NASDI did not comply with the Subcontract's documentation procedures, even after SKK alerted NASDI to the requirements.[14]  NASDI does not point to evidence showing that it gave SKK contemporaneous notice of any of the conditions of which it complains here.

NASDI makes several arguments to excuse its failure to comply with §7.  It maintains that these requests for additional payments are governed by §6.1.2, which does not require the formal notice set forth in §7; that compliance with §7 is excused since SKK was on actual notice of the expenses that NASDI incurred; and that compliance with §7 is excused since it

---

[14] NASDI argues that Higgins's credibility should be tested at trial.  Higgins has sued NASDI for unpaid wages.

was impossible for NASDI to track the additional costs associated with the Project changes.  None of these arguments succeeds in excusing NASDI's compliance with the notice provisions in §7.

Section 6.1.2

NASDI first argues that, since SKK rather than the PA was responsible for these changes to its work, its right to additional compensation is governed by §6.1.2 and not by §7. When the Subcontract is read as a whole, it is clear that §6.1.2 did not relieve NASDI of its obligation to make a timely claim in writing to SKK for additional payment due to changes in its work during Stages 1 and 2.

Section 6 is entitled "Changes and Extras."  It allowed SKK to change the work NASDI must perform "at any time," noting that such changes would not invalidate the Subcontract but would result in an adjustment to the Subcontract price or schedule.

Section 6.1.1 addressed changes in the work "initiated by" the PA.  It explained that NASDI had to promptly submit any claims it might have for those changes and that SKK would be liable only to the extent that the PA was liable.

Section 6.1.2 addressed other changes in the work to be performed by NASDI.  It provides:

> Changes in the Subcontractor's Work not initiated or payable to Contractor by Owner shall be payable

35

> pursuant to separate written agreement.  If Contractor
> orders such work to be performed on a Time & Materials
> basis, such work will be payable as provided for in
> Exhibit D, annexed.

(emphasis supplied).  Section 6.1.2 does not address much less obviate NASDI's obligation to give notice of any claim pursuant to the procedures set forth in §7.  Instead, it describes how SKK is to furnish payment to NASDI upon changes in NASDI's work when those changes were not "initiated" by the PA or "payable to" SKK by the PA.[15]  It says nothing about how NASDI is to raise or substantiate those requests.  This reading is confirmed by §6.4.

Section 6.4 explains that NASDI must immediately commence performance of the work required by SKK "regardless [of] whether agreement has been reached on the adjustment of the Subcontract Price," and that a failure to do so "shall constitute a material breach of the Subcontract."  NASDI may, under that same provision, "reserve its rights to extra compensation" resulting from any change in its work "if same has not been agreed upon at the time of such Contactor's direction, by delivering to Contractor written notice of a Claim therefor pursuant to Section 7, or 23."

---

[15] NASDI has not offered evidence that the extra work for which NASDI seeks compensation was not initiated or to be compensated by the PA.  This failure constitutes a separate ground for granting this branch of SKK's summary judgment motion.

36

The Subcontract therefore, when its terms are read together to give effect to each provision, unambiguously required NASDI to submit all claims for extra compensation to SKK pursuant to the notice provisions of §7.  See Holick v. Cellular Sales of New York, LLC, 802 F.3d 391, 395 n.9 (2d Cir. 2015) ("In New York, a contract's clauses should be read together contextually in order to give them meaning.") (citation omitted).

In opposing this motion, NASDI relies principally on the deposition testimony of SKK witnesses who explained that a request for additional compensation "starts with a conversation."  The SKK witnesses, however, were also clear that regardless of whether SKK or the PA is responsible for the modification of work, NASDI's request for additional compensation must follow the Subcontract's notice procedures and be accompanied by the appropriate documentation.

Actual Notice

NASDI next argues that it was not required to give formal notice of the cost overruns at Stages 1 and 2 because SKK was on "actual notice" of the cost overruns on which it brings suit.[16] This argument fails.

_____

[16] In making this argument, NASDI relies in part on an internal SKK document estimating that NASDI's costs at Stages 1 and 2 would exceed the Subcontract's estimate and SKK's request to the PA for additional funds so that NASDI could complete the Stage 4

It is well-established under New York law that actual
notice is not a substitute for compliance with notice-of-claim
provisions.  "Express conditions precedent, which are those
agreed to and imposed by the parties themselves, must be
literally performed."  Klewin Bldg. Co., Inc. v. Heritage
Plumbing & Heating, Inc., 840 N.Y.S.2d 144, 145 (2d Dep't 2007)
(citation omitted); see also Mezzacappa Bros., Inc. v. City of
N.Y., 815 N.Y.S.2d 549, 550 (1st Dep't 2006) (same).  New York
courts routinely dismiss contractor claims where the plaintiff
has failed to strictly comply with notice-of-claim requirements.
See, e.g., Schindler Elevator Corp. 30 N.Y.S.3d at 710; Tougher
Indus., Inc. v. Dormitory Auth. of State, 15 N.Y.S.3d 262, 267
(3d Dep't 2015); Fahs Const. Grp., Inc. v. State, 999 N.Y.S.2d
244, 246 (3d Dep't 2014); Dart Mech. Corp. v. City of New York,
891 N.Y.S.2d 76, 77 (1st Dep't 2009).  Accordingly, even if SKK
was aware of NASDI's increased costs associated with the extra
work that underlies this breach of contract claim, that did not
relieve NASDI of its obligation to comply with the §7 notice
provisions.

During discovery, NASDI identified ten letters that it
claims provided SKK with notice of its cost overruns.  SKK

---

work.  These documents do not relate to the extra work claims
NASDI asserts in this lawsuit.

submitted those ten letters in support of its motion for summary
judgment. SKK is correct that none of the documents suggests
that SKK was "on notice" of NASDI's purported additional costs,
that is, the costs associated with the three changes to the
scope of NASDI's work at Stages 1 and 2 on which NASDI brings
suit.[17] The letters describe in general terms, for instance, a
complaint that NASDI's prior owner had "grossly undervalued" the
cost to complete Stages 1 and 2, the PA's direction to leave in
place various elements of the Bridge that had been slated for
removal, and the additional work needed to remove transformer
and storage room floors. While two letters refer to §7 and
request an equitable adjustment in payment and extension of
time, NASDI does not argue that either of these letters
concerned the Stages 1 and 2 conditions at issue in this
lawsuit.[18] Nor does NASDI assert that it ever supplemented these
letters with a specific request for extra monies.

Frustration and Impossibility

NASDI finally argues that SKK frustrated its attempts to
comply with the notice provisions. In order to survive summary

---

[17] Several of the letters demand additional money for costs
associated with Stage 4, and therefore address the cost of work
that NASDI never performed.

[18] Neither of these letters requests a specific sum of money or
documents how much the changes have cost NASDI.

judgment for reason of frustration, NASDI must raise a triable issue of fact that SKK's "alleged misconduct impaired [NASDI's] ability to fulfill [its] contractual undertakings." A.H.A. Gen. Const., Inc. v. New York City Hous. Auth., 92 N.Y.2d 20, 34 (1998).

NASDI makes two discrete frustration arguments.  It asserts first that it did not learn that the PA and SKK had decided to delete the Sidewalk Conversion until 2015.  When NASDI learned in 2015 that it would not have to convert the sidewalk, it calculated the credit to which SKK was entitled.  If NASDI subsequently understood that it was also entitled to payments for extra work associated with that change, it has pointed to nothing that SKK did that prevented NASDI from filing that claim.

NASDI also argues generally that the changes to NASDI's work were so pervasive that it could not seek additional compensation on a time-and-materials basis.  The sole evidence NASDI has offered in support of this argument is testimony from SKK's superintendent for demolition in response to a question about NASDI's ability to submit Time and Materials documentation when NASDI's crew was in place, but the PA was not prepared to proceed.  The superintendent agrees only that NASDI could not have completed a Time & Materials ticket if NASDI's crews went

instead to work on another task on the Project.[19]  This testimony
does not raise a question of fact as to whether SKK impeded
NASDI's ability to track its costs and submit timely claims
either generally or for those changes to the scope of its work
at issue here.[20]

II.  Quantum Meruit

SKK moves for summary judgment on NASDI's quantum meruit
claim.  To recover in quantum meruit, a plaintiff must establish
"(1) the performance of services in good faith, (2) the
acceptance of the services by the person to whom they are
rendered, (3) an expectation of compensation therefor, and (4)
the reasonable value of the services."  Mid-Hudson Catskill
Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168,

[19] NASDI's Dore Declaration states in conclusory terms that SKK
made it impossible for NASDI to track costs.  That assertion is
belied by Dore's testimony as NASDI's corporate designee.  In
his deposition, Dore admitted that NASDI could have tracked its
Time and Materials costs for expenses related to access,
nighttime work, and weekend work.  See Crawford v. Franklin
Credit Mgmt. Corp., 758 F.3d 473, 481-82 (2d Cir. 2014) ("[A]
party's factual assertion in an affidavit opposing summary
judgment, contradicting his prior deposition testimony, may be
disregarded as a sham attempt to create an issue of fact.").

[20] Citing AHA General Construction, 92 N.Y.2d at 33-34, NASDI
briefly argues that strict enforcement of the contractual notice
provisions is "contrary" to public policy since, NASDI argues,
the changes to the Project did not involve the PA.  The argument
misreads the law.  Even if NASDI had shown that the PA was not
involved in the changes to the Project at issue here,
enforcement of the clear terms of a contract between two
sophisticated parties is not contrary to public policy.

175 (2d Cir. 2005) (citation omitted).  Under New York law, a
party cannot recover in quantum meruit when there is a valid and
enforceable written contract governing the same subject matter.
See Clark Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d
382, 388 (1987); Corp. v. Lanmark Grp., Inc., 125 N.Y.S.3d 98,
98 (1st Dep't 2020).

NASDI seeks damages in quantum meruit in connection with
services it provided during Stages 1 and 2 of the Subcontract.
This request is based upon the same work for which it seeks
recovery on its breach of contract claim.  Because the
Subcontract is an enforceable written agreement, NASDI's right
to recover for work performed pursuant to the Subcontract is
governed by that contract.  Therefore, SKK is entitled to
summary judgment of NASDI's quantum meruit claim.

NASDI asserts that SKK's changes to the Project constituted
abandonment of the Subcontract and entitle NASDI to recover
damages under a quantum meruit theory.  As explained above,
NASDI has not presented admissible evidence to raise a question
of fact in support of its assertion that SKK abandoned the
Subcontract.  And in fact, both SKK and NASDI continued to
perform under the Subcontract long after the work on Stages 1
and 2 had ended.

III. Implied Covenant of Good Faith and Fair Dealing

NASDI asserts, in opposition to SKK's motion for summary judgment, that SKK violated the covenant of good faith and fair dealing when it internally revised its estimate in 2016 of the amount due NASDI.[21]  SKK's motion for summary judgment on NASDI's claim is granted.

"Under New York law, implicit in every contract is a covenant of good faith and fair dealing . . . which encompasses any promises that a reasonable promisee would understand to be included." Spinelli v. Nat'l Football League, 903 F.3d 185, 205 (2d Cir. 2018) (citation omitted).  "This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement," Refreshment Mgmt. Servs., Corp. v. Complete Office Supply Warehouse Corp., 933 N.Y.S.2d 312, 315 (2d Dep't 2011) (citation omitted), that is, the right to receive "the fruits of the[ir] contract." Spinelli, 903 F.3d at 205 (citation omitted).  "The doctrine is employed when necessary to

_____

[21] NASDI's theory regarding SKK's breach of the covenant of good faith and fair dealing has shifted.  In the complaint, NASDI pled that SKK violated the covenant by "refusing to present NASDI's change orders and other Claims to the Port Authority, and instead [agreeing] to a global settlement with the Port Authority without allocating the funds received to affected subcontractors."

43

effectuate the intentions of the parties, or to protect their reasonable expectations." Gaia House Mezz LLC v. State St. Bank & Trust Co., 720 F.3d 84, 93 (2d Cir. 2013) (citation omitted).

"Since there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007). The implied covenant does not impose obligations that would be inconsistent with the parties' contract. See Dalton v. Educational Testing Serv., 87 N.Y.2d 384, 389 (1995).

NASDI now asserts that SKK breached its duty of good faith after it learned that the PA would require SKK to allocate the settlement funds being paid by the PA among all of the subcontractors to address the costs associated with the delay in Stage 4.[22] In the event of an unallocated settlement, §7.2.5 of the Subcontract directs the parties to confer in good faith to determine NASDI's portion of the settlement. If the parties do not agree, the Subcontract makes any decision by SKK made "in

---

[22] NASDI's assertion that SKK owed an implied duty by virtue of the Subcontract is in tension with NASDI's argument that SKK had abandoned the Subcontract long before the 2016 settlement allocation. In its brief in opposition to this motion, NASDI explicitly "disputes the existence of a valid contract."

good faith" "binding and conclusive."  Thus, SKK also had an explicit contractual duty to act in good faith.

NASDI's allegation that SKK operated in bad faith during the allocation process rests almost exclusively on the fact that in late 2016 and again in early 2017 SKK reduced its estimate of the amount owed to NASDI.[23]  As of June 2016, SKK estimated the total value of NASDI's claims as $5 million.  In November 2016, SKK's revised that amount downward to $4 million.  SKK did not provide these internal estimates to NASDI.  After the PA advised SKK that SKK would be responsible for allocating the PA settlement amount for Stage 4 delay among the participants in the Project, SKK revised its estimate again.  In that final revision, SKK calculated that it was NASDI that owed SKK.  SKK determined that NASDI owed $733,000 to SKK.  This is the figure that SKK provided to NASDI in the February 1 Letter.

NASDI is correct that SKK was bound to exercise its discretion regarding NASDI's entitlement to any settlement proceeds in good faith.  SKK has presented evidence that it

---

[23] In January 2017, SKK performed another internal estimate of the value of NASDI's delay damages for Stage 4.  In that document, SKK set forth a "Best Case" estimate of a $213,257.61 credit to SKK and a "Worst Case" of $465,032.67 due to NASDI. The February 1 Letter contains a further revision of this figure showing that NASDI was due $602,526.73 for the cost of delay in the start of Stage 4.  When combined with credits due to SKK, SKK arrived at the conclusion that NASDI would owe SKK roughly $733,000 in a global settlement.

arrived at its February 1 calculation in good faith.  In the February 1 Letter, SKK explained its calculation in detail and provided supporting documentation for its calculation to NASDI. The letter discusses NASDI's anticipated extra costs during Stage 4 due to Project delays and the impact from changes to the scope of NASDI's work, including the elimination of the Sidewalk Conversion.  SKK also explained why it rejected NASDI's assumptions in its calculation of its extra costs in its June Claim.

NASDI has failed to present evidence that raises a question of fact as to whether SKK complied with its duty to act in good faith.  Other than pointing to the existence of the revisions, NASDI has not offered any evidence that SKK made the revisions in bad faith.  NASDI does not refer in its brief or Rule 56.1 statement to any evidence to cast doubt on the accuracy of the analysis set forth in the February 1 Letter.  Accordingly, SKK is entitled to summary judgment on the claim for the breach of the duty of good faith.

IV.  SKK's Counterclaims

SKK seeks a judgment of liability on its counterclaims for breach of the Subcontract and for contractual indemnification of the costs to SKK to complete Stage 4.  SKK is awarded summary judgment on its counterclaim for breach of contract.  Its motion

46

for summary judgment on its counterclaim of contractual
indemnification will be resolved at a bench trial where the
Court will address the merits of the counterclaim and, if
appropriate, award damages.

In opposition to this motion, NASDI does not address SKK's
counterclaims.  Even without an opposition, SKK must still
demonstrate that it is entitled to judgment as a matter of law
based on the undisputed facts in the record.  D.H. Blair & Co.
v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006).  The elements of
a breach of contract claim are set forth above.

SKK is entitled to a finding of liability on its
counterclaim for breach of contract.  As explained above, the
parties entered into the Subcontract, which was in force when
NASDI refused to perform Stage 4 demolition work.  SKK has
provided evidence that it performed its obligations under the
Subcontract and NASDI has not presented evidence that raises a
question of fact regarding that performance.  The breaches of
contract by SKK that NASDI asserts have been discussed and
rejected.  SKK was entitled to make alterations to the schedule
and scope of work under §§6 and 7 of the Subcontract.  SKK has
submitted the record of its payments to NASDI.

The unambiguous terms of the Subcontract state that a
refusal to perform work constitutes a default.  It is not

disputed that NASDI, after receiving notice and an opportunity to cure, defaulted on the Subcontract when it refused to work on Stage 4 of the Project.

## Conclusion

SKK's motion of February 28 for summary judgment on NASDI's claims is granted.  SKK is also granted summary judgment on its counterclaim for breach of contract to the extent of a finding of liability against NASDI.  The amount of damages due SKK for that breach and SKK's claim for indemnification will be decided at trial.

Dated:    New York, New York
          September 28, 2020


_____
DENISE COTE
United States District Judge